COURT OF APPEALS OF VIRGINIA

Present: Judges Petty, Athey and Senior Judge Frank
Argued by videoconference

LAMORIA WITCHER OLIVER

MEMORANDUM OPINION[*] BY
v.      Record No. 0848-20-2      JUDGE CLIFFORD L. ATHEY, JR.
JULY 6, 2021

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF NOTTOWAY COUNTY
Paul W. Cella, Judge

(Marlene A. Harris, on brief), for appellant. Appellant submitting
on brief.

Ken J. Baldassari, Assistant Attorney General (Mark R. Herring,
Attorney General; Erica L. Sieg, Assistant Attorney General, on
brief), for appellee.

Following a bench trial, the appellant, Lamoria Oliver ("Lamoria"), was convicted of

maliciously wounding her estranged husband James Oliver ("James"), in violation of Code

§ 18.2-51.2(A), and using a firearm in the commission of a felony, in violation of Code

§ 18.2-53.1. The trial court sentenced her to a total of thirty-three years' imprisonment on the

two charges, with twenty-three years suspended. On appeal, Lamoria argues that the evidence at

trial was insufficient to establish that she shot her estranged husband. We disagree, and therefore

affirm the judgment of the trial court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I.  FACTUAL BACKGROUND[1]

On the evening of April 7, 2019, James received a phone call from his estranged wife, Lamoria, at his residence.  James ignored the call because he was not regularly communicating with Lamoria at that time.  About fifteen minutes after the phone call, James heard knocking on his bedroom window, and Lamoria requesting that he come outside to speak with her.  Initially, James refrained from responding to her request to come outside.  Eventually, James looked outside and cautiously walked out the front door of his residence.  He noticed a "tanish color" SUV backed into his driveway.  Although he could not see or hear anyone, he testified that he had a bad feeling that something was near him.  When he attempted to quickly go back into his house, he was shot repeatedly in the back.  James fell to the ground unable to walk.  He managed to crawl towards his house while calling out for his nephew, Jaesean Peebles ("Jaesean"), who was staying at James' house that night.

Jaesean testified that he was in his bedroom lying on his bed that evening when Lamoria entered the house and opened his bedroom door around 8:00 p.m.  She spoke to him briefly and then left the room.  Soon after this encounter, Jaesean heard gunshots, which he initially disregarded because gunshots are common in the rural area where James' house is located.  Jaesean then heard James calling out to him from the front yard, so he went to the front door, looked outside, and saw James lying in the yard bleeding.  Jaesean also noticed that there were no additional vehicles or persons in the driveway.  Next, Jaesean called the police, who requested that he ask James who shot him.  James responded to Jaesean's inquiry that it was "Lamoria's friend."  James, who was badly wounded, remembers Jaesean coming outside but nothing else

---

[1] Pursuant to familiar appellate principles, the evidence is summarized in the light most favorable to the Commonwealth, the prevailing party at trial.  Gerald v. Commonwealth, 295 Va. 469, 472 (2018).

before regaining consciousness at Virginia Commonwealth University Medical Center. James received five gunshot wounds, three of which penetrated his lungs.

Nottoway County Sheriff's Deputy Matt Spencer ("Deputy Spencer") responded to the scene and found James lying on the ground near the front door of the house. While James was unconscious when he arrived, medical personnel were later able to revive him. Deputy Spencer noticed that while James was able to talk, he was confused and could not carry on a conversation. Deputy Spencer asked James who had shot him, to which James repeatedly responded, "Lamoria's friend." Deputy Spencer next investigated the scene of the crime by taking photographs, collecting evidence, and creating a diagram. Deputy Spencer also found a cluster of bullet casings near the end of the driveway, about fifteen feet from where James was found.

Nottoway County Sheriff's Lieutenant Robert Jones ("Lieutenant Jones") was also dispatched to investigate the incident. Lieutenant Jones contacted Lamoria, who stated that she had been speaking with James in his front yard when an unidentified individual ran up from an old store adjacent to the property and shot at them. She confirmed that during this shooting by an unidentified person, she was in the front yard of the house about fifteen to twenty feet from the front door. She failed to provide any description of the shooter, stating that she immediately ran to her vehicle and left the scene after the shots were fired by the unknown assailant. Lamoria also confirmed that she was driving a blue SUV that night.

Lamoria's brother, Corey Oliver ("Corey"), testified that Lamoria left their grandmother's house alone sometime between 7:00 p.m. and 8:00 p.m., and upon her return, she was still alone and acting "terribly." Corey's girlfriend, who was also at their grandmother's house, stated that Lamoria left the house alone and returned "distraught."

On April 11, 2019, Lieutenant Jones interviewed Lamoria a second time. She told Lieutenant Jones that she alone drove her blue Hyundai Santa Fe to James' house the evening of the shooting. She further stated that when she arrived at James' house, he greeted her, they walked through the house together, and then they both talked outside in the front yard. She also asserted that Jaesean came to the doorway and watched their conversation. She reconfirmed that it was during this time that an unidentified individual ran up shooting at them. She also reconfirmed that she immediately got into her vehicle following the shooting and fled the scene. She was still unable to give any description of the shooter but confirmed again that she arrived and left James' house alone.

At trial, Lamoria moved to strike the Commonwealth's evidence at the conclusion of their case-in-chief as well as at the conclusion of all the evidence, arguing that no direct evidence tied her to the shooting which caused James' injuries. The trial court denied Lamoria's motions and found her guilty of aggravated malicious wounding and use of a firearm in the commission of a felony. Lamoria now appeals those convictions.

## II. ANALYSIS

We review the evidence in the light most favorable to the Commonwealth, as the prevailing party below, and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "The credibility of the witnesses and the weight accorded the evidence are matters solely for the [trial court] who has the opportunity to see and hear that evidence as it is presented." Sandoval v. Commonwealth, 20 Va. App. 133, 138 (1995). "Furthermore, we 'accord the Commonwealth the benefit of all inferences fairly deducible from

- 4 -

the evidence.'" Brooks v. Commonwealth, 282 Va. 90, 95 (2011) (quoting Glenn v. Commonwealth, 275 Va. 123, 130 (2008)).  In a challenge to the sufficiency of the evidence, we must "examine the evidence that supports the conviction and allow the conviction to stand unless it is plainly wrong or without evidence to support it."  Commonwealth v. McNeal, 282 Va. 16, 20 (2011) (quoting Vincent v. Commonwealth, 276 Va. 648, 652 (2008)).

Code § 18.2-51.2(A) provides that it is unlawful when any person "maliciously shoots, stabs, cuts or wounds any person, or by any means causes bodily injury, with the intent to maim, disfigure, disable or kill . . . if the victim is thereby severely injured and is caused to suffer permanent and significant physical impairment."  Additionally, Code § 18.2-53.1 makes it "unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm . . . while committing or attempting to commit murder . . . ."

Lamoria challenges the trial court's decision to deny her motions to strike and her ultimate convictions because she claims the evidence that she was the perpetrator of the crimes was insufficient.  Specifically, she argues that no physical evidence tied her to the shooting, and there was no proof of the identity of the shooter.

When considering circumstantial evidence, a factfinder cannot arbitrarily disregard a reasonable hypothesis of innocence.  Even so, "the reasonable-hypothesis principle is not a discrete rule unto itself."  James v. Commonwealth, 53 Va. App. 671, 681 (2009) (quoting Haskins v. Commonwealth, 44 Va. App. 1, 8 (2004)).  "Whether the hypothesis of innocence is reasonable is itself a 'question of fact,' subject to deferential appellate review."  Clanton v. Commonwealth, 53 Va. App. 561, 572-73 (2009) (*en banc*) (citation omitted).  "Merely because defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded."  Id.

On review by this Court, "the question is not whether 'some evidence' supports the hypothesis, but whether a rational factfinder could have found [that] the incriminating evidence renders the hypothesis of innocence unreasonable." James, 53 Va. App. at 682 (citing Hudson v. Commonwealth, 265 Va. 505, 513 (2003)). Circumstantial evidence is not "viewed in isolation." Brown v. Commonwealth, 54 Va. App. 107, 119 (2009) (quoting Muhammad v. Commonwealth, 269 Va. 451, 479 (2006)). Rather, the "combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion." Id.

"By finding the defendant guilty, . . . the fact finder 'has found by a process of elimination that the evidence does not contain a reasonable theory of innocence.'" James, 53 Va. App. at 681 (quoting Haskins, 44 Va. App. at 9). That conclusion "is itself a 'question of fact,' subject to deferential appellate review." Id.

Here, the evidence clearly established that Lamoria was present at the time of the shooting. She told Lieutenant Jones that she was outside with James when he was shot and that she arrived alone. However, the rest of her account directly contravenes other physical evidence and the testimony of other witnesses. Lamoria claims that she was speaking to James outside in the front yard and that his cousin, Jaesean, was watching from the front door of the house, when an unidentified individual ran at them from a nearby building and shot James. James testified, however, that he never spoke to Lamoria on that night, and Jaesean stated that he was not outside in the front yard until after the shooting. The location of the shell casings also stands in marked contrast to her version of events, as the casings were all at a single location in the driveway, which is inconsistent with someone running at them and shooting from an adjacent building. Lamoria also stated that she walked with James throughout the house before speaking to him outside, which James contradicts.

The trial court was not required to fully accept Lamoria's explanation regarding the night her estranged husband was shot multiple times. "In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal [her] guilt." Flanagan v. Commonwealth, 58 Va. App. 681, 702 (2011). "A defendant's false statements are probative to show [she] is trying to conceal [her] guilt, and thus is evidence of [her] guilt." Taylor v. Commonwealth, 61 Va. App. 13, 31 (2012) (quoting Rollston v. Commonwealth, 11 Va. App. 535, 548 (1991)). The trial court was also free to conclude in this case that James' initial identification of the shooter as "Lamoria's friend" was due to the extreme stress and confusion of the moment, after falling unconscious on the ground and only recollecting arriving at the hospital.

There was sufficient evidence to allow a reasonable trier of fact to conclude that Lamoria shot her estranged husband that night. Testimony was presented from multiple individuals that Lamoria arrived alone at James' house. Both Corey and Corey's girlfriend stated that Lamoria left their grandmother's house alone right before the time of the shooting, then returned alone and distraught. James testified that Lamoria initially called his cell phone, then subsequently heard knocking on his window, along with Lamoria asking him to come outside. James also recalled that a "tanish" SUV was the only different vehicle parked outside on his driveway, and Lamoria admitted to driving her blue SUV alone that night. Additionally, the trial court, having heard all the evidence, concluded that Lamoria's statements were merely a fabrication meant to cover up her actions, and was thus evidence of her own guilt. Moreover, her version of events is not corroborated by much of the evidence and is in fact contradicted by multiple witnesses and other physical evidence.

Thus, the trial court was not plainly wrong in denying Lamoria's motions to strike and ultimately finding her guilty of aggravated malicious wounding and the use of a firearm during the commission of a felony.

## III. CONCLUSION

For these reasons, we affirm the decision of the trial court.

<u>Affirmed.</u>